**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.     A-3269-22
                       A-3472-22

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

RAUL TORRES,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

CARLOS BURGOS,

      Defendant-Appellant.

_____

Submitted February 10, 2025 – Decided March 20, 2025

Before Judges Gooden Brown and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 19-09-1080.

Jennifer N. Sellitti, Public Defender, attorney for appellant in A-3269-22 (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Jennifer N. Sellitti, Public Defender, attorney for appellant in A-3472-22 (Samuel Carrigan, Assistant Deputy Public Defender, of counsel and on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent in A-3269-22 (Deepa S. Y. Jacobs, Assistant Prosecutor, of counsel and on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent in A-3472-22 (Jaimee M. Chasmer, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

In these back-to-back appeals, which we consolidate for purposes of issuing a single opinion, defendants Raul Torres and Carlos Burgos entered negotiated guilty pleas to first-degree aggravated manslaughter, first-degree armed robbery, and related conspiracy and weapons possession offenses. They were each sentenced to an aggregate thirty-year prison term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

The charges stemmed from the shooting death of David Duque-Soto in his apartment during a robbery planned by defendants and three codefendants. Except for Torres, all the defendants provided statements to police with varying accounts of how the plan was hatched. Torres and Burgos both filed motions to

2

dismiss the indictment, which were denied by the trial court. Torres's motion to suppress evidence seized from his jail cell with a warrant after law enforcement suspected his involvement in witness tampering was also denied.

On appeal, in A-3269-22, Torres raises the following arguments for our consideration:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS THE EVIDENCE FOUND IN HIS JAIL CELL BECAUSE THE CERTIFICATION SUBMITTED IN SUPPORT OF THE SEARCH WARRANT LACKED SUFFICIENT FACTS TO FIND PROBABLE CAUSE TO BELIEVE THAT HIS JAIL CELL WOULD CONTAIN EVIDENCE OF WITNESS TAMPERING. U.S. CONST. AMEND. IV; N.J. CONST., ART. I, PAR. 7.
>
> POINT II
>
> THE COURT ERRED IN NOT DISMISSING THE INDICTMENT AS DEFECTIVE BECAUSE DETECTIVE KEVIN MATTHEW GAVE IMPROPER AND SPECULATIVE OPINION TESTIMONY, AND BECAUSE IT WAS LATER DISCOVERED THAT HE HAD ENGAGED IN EVIDENCE TAMPERING.
>
> POINT III
>
> THE 30-YEAR NERA SENTENCE IS MANIFESTLY EXCESSIVE AND UNDULY PUNITIVE FOR THIS YOUTHFUL OFFENDER WITH NO CRIMINAL HISTORY.

In A-3472-22, Burgos raises the following arguments for our consideration:

POINT I

THE COURT ERRED IN DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT BECAUSE DETECTIVE KEVIN MATTHEW GAVE IMPROPER AND SPECULATIVE OPINION TESTIMONY BEFORE THE GRAND JURY AND THE STATE FAILED TO PRESENT DEFENDANT'S EXCULPATORY STATEMENT.

    A.    Detective Matthew Inappropriately Shared His Opinion Speculating About Significant Details Of The Robbery And Shooting.

    B.    The State Failed To Introduce Burgos's Statement Denying His Involvement And Directly Negating His Guilt.

POINT II

THE SENTENCE IS EXCESSIVE.

    A.    Extending Defendant's Long Sentence By Going Above The Midrange And Imposing The Maximum Would Have No Added Deterrent Effect; The Goal Of Deterrence Does Not Support The Maximum Sentence.

    B.    Because The Age-Crime Curve Demonstrates That The Risk Of Recidivism Declines Dramatically As Age Increases And Is Substantially Lower At The Age That Defendant Will Complete A

4 <span>A-3269-22</span>

Midrange Sentence, The Goal Of Incapacitation Cannot Justify Imposing The Maximum Sentence.

C.    The Court Should Have Given More Weight To Burgos As He Appeared Before The Court At Sentencing And Less Weight To The Prosecutor's Recommendation.

We have considered these arguments in light of the record and applicable legal principles. We reject each of the points raised and affirm.

## I.

On September 26, 2019, a Bergen County grand jury returned a twelve-count indictment charging Torres and Burgos with first-degree robbery, N.J.S.A. 2C:15-1(a)(1) (count one); second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2(a)(1) and 2C:15-1(a)(1) (count two); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count three); first-degree murder, N.J.S.A. 2C:11-3(a)(1) (count four); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count five); and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count six). Torres was also charged with third-degree unlawful possession of a sawed-off shotgun, N.J.S.A. 2C:39-3(b) (count eleven). Codefendants Lexie Burke, David Martinez, and Dylan Rodriguez were also charged in the indictment with various offenses.

5

After defendants' motions to dismiss the indictment and Torres's motion to suppress evidence seized from his jail cell were denied, Torres and Burgos entered negotiated guilty pleas to counts one, two, five, and six as well as counts three and four as amended to charge aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1). At the respective plea hearings, Torres and Burgos each admitted conspiring with each other and the other codefendants to rob Duque-Soto, a suspected drug dealer, in his Fairview apartment on June 29, 2019. To that end, Torres, Burgos, Burke, and Martinez drove to the victim's apartment after discussing the plan at a nearby Delta gas station. Rodriguez did not accompany defendants to the victim's apartment but had participated in the planning of the robbery. Armed with handguns, Torres and Burgos entered the apartment along with Burke while Martinez remained in the vehicle to serve as the getaway driver. While inside the apartment, Torres and Burgos fired their weapons, fatally wounding Duque-Soto.

Following appropriate mergers, defendants were each sentenced to a thirty-year prison term, subject to NERA, on count three, and a concurrent five-year prison term, with a forty-two-month period of parole ineligibility, on count six, in accordance with the terms of the plea agreement. The trial judge entered

memorializing judgments of conviction on May 25, 2023, and these appeals followed.

## II.

In Point I of Torres's brief, Torres argues that the judge erroneously denied his motion to suppress the evidence seized from his jail cell "because the application in support of the search warrant failed to establish probable cause that the cell would contain evidence of witness tampering" and the warrant "was executed in an objectively unreasonable manner."[1] We disagree.

On November 2, 2022, Bergen County Prosecutor's Office (BCPO) Detective Daniel Tanelli submitted a search warrant application to search Torres's and Rodriguez's cells.[2] According to the supporting certification prepared by Tanelli, during the investigation of Duque-Soto's homicide, it was learned that Rodriguez, who was aware of the robbery/homicide but not present when it was carried out, was in possession of one of the handguns used in the homicide. During his Mirandized[3] statement to law enforcement on July 1,

---

[1] "[O]nly motions for suppression on the grounds of unlawful search and seizure automatically survive the entry of a guilty plea." State v. Greeley, 178 N.J. 38, 50-51 (2003) (emphasis omitted).

[2] On appeal, Torres only challenges the search of his cell.

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

2019, Rodriguez admitted that he had received the gun from Burgos and knew it had been used in Duque-Soto's homicide the day before. Rodriguez also assisted law enforcement in identifying Torres as one of the participants in the crimes.[4]

Rodriguez agreed to cooperate with law enforcement and testified at Burke's trial on March 2, 2022. During his testimony, Rodriguez recounted that Burke had gone to Duque-Soto's apartment prior to the robbery/homicide to purchase marijuana for Rodriguez but did not make the purchase. During a subsequent meeting at a gas station, Burke, Martinez, Burgos, and Torres planned to go back to Duque-Soto's apartment to rob him but Rodriguez had no interest in participating and "made an excuse as to why he could not go." Thereafter, Burke, Martinez, Burgos, and Torres went to Duque-Soto's apartment and committed the "armed robbery turned murder," but Rodriguez denied that the murder weapon was his and maintained that Burgos gave it to him the day after Duque-Soto was killed. Tanelli averred that Rodriguez's account was verified through a court-authorized search of Burke's cell phone,

---

[4] Rodriguez consented to law enforcement accessing his Instagram account to assist in identifying Torres.

which revealed that the day prior to the robbery/homicide, Burke and Martinez planned the armed robbery via text message.

Tanelli further certified that Burke later became a cooperating witness and revealed during a proffer that contrary to Rodriguez's account, the murder weapon was provided to Martinez by Rodriguez. After obtaining corroboration of Burke's proffer from Rodriguez's cell phone in the form of text messages and pictures, Rodriguez was charged with felony murder, armed robbery, conspiracy to commit armed robbery, perjury,[5] and other offenses. On July 1, 2022, Rodriguez was arrested on the charges and detained in the Bergen County Jail along with Torres. Almost three months later, on September 30, 2022, Torres filed a supplemental letter brief to support his July 1, 2022, motion to sever his upcoming trial from his remaining codefendants. In the supplemental brief, Torres stated that "Rodriguez [was] now a necessary witness for the defense at [Torres's] trial."

Tanelli continued that on October 31, 2022, "one month after Torres'[s] supplemental severance brief" was filed, the State received an undated notarized affidavit "purportedly authored" by Rodriguez exculpating Torres of any

_____

[5] Although Rodriguez was charged with perjuring himself at Burke's trial, the charge was related to Rodriguez downplaying his own involvement in the crimes.

involvement in Duque-Soto's robbery/homicide and attacking Burke's credibility. The affidavit read:

> On the day of questioning I Dylan Rodriguez lied under oath by providing law enforcement with false testimony and falsely identifying Raul Torres as a [sic] actor to [David Duque-Soto's] murder[.] At the time [I] was mentally pressured and scared so my mind was set on identifying anybody the police wanted me to identify[.] [J]ust to get away from the situation at the moment[, I] falsely identified Raul Torres[.]
>
> I feel bad because Lexie Burke confessed to me that he was also scared so he also falsely identified Raul Torres just to avoid criminal prosecution[.]
>
> The truth is that [I] [do not] even know Raul Torres and he had nothing to do with [David Duque-Soto's] murder[,] he is innocent of the charges against him and is being falsely identified by me and Lexie Burke and [I] can not stand by and let the system wrongly convict him[.]

According to Tanelli, the Rodriguez affidavit "directly contradicts all of Rodriguez's prior statements and the documentary evidence, specifically the video [surveillance] evidence that puts Torres at the scene at the time of Duque-Soto's murder and captures him running from Duque-Soto's apartment and dropping the magazine of a handgun from his waistband." Tanelli certified he believed Rodriguez's affidavit was "a sham," and that "Torres and his associates

may be embarking on a campaign of intimidation and or tampering and utilizing

. . . Rodriguez."

Tanelli expounded:

> Throughout this case Rodriguez's statements about Torres'[s] involvement never wavered nor ever contradicted. In fact, Rodriguez's untruthfulness was directly related to his personal involvement, and no one else's. This recently provided . . . [a]ffidavit cuts against the weight of the evidence in this case and appears to be the product [of] tampering, or, if true, intimidation. A search of both Torres['s] and Rodriguez's jail cells is likely to uncover communication between the two, drafts, and or notes that will further the investigation into whether the Rodriguez [a]ffidavit is legitimate or the product of intimidation and tampering by or on behalf of Raul Torres—the only co-defendant identified in this affidavit. It is particularly noteworthy that this affidavit was received only one month after Torres identified Rodriguez, who was only recently incarcerated at the Bergen County Jail, as a material witness to Torres'[s] defense in his upcoming trial.

Among other things, in the application, Tanelli sought:

> Evidence, including but not [limited to] media, audio/digital recordings, letters, notes, mail, books, drawings, pictures, documents or other writings demonstrating a relationship between the victim, the suspect(s), the witnesses, and the commission and/or motive for the crime or cover-up of the crimes; any and all computers, including but not limited to tablet computers, computer systems, cellular telephones, devices capable of storing electronic data, electronic data storage media, stored electronic data, and related

11

peripherals . . . demonstrating a relationship between the victim, the suspect(s), witnesses, and the commission and/or motive for the crime; as well as any other instrumentalities and paraphernalia that are evidence of the commission of a crime in violation of the [l]aws of the State of New Jersey, to wit: N.J.S.A. 2C:11-3(a)(l) to (2), [m]urder; N.J.S.A. 2C:11-3(a)(3), [f]elony [m]urder; N.J.S.A. 2C:15-l(a)(l), [a]rmed [r]obbery; N.J.S.A. 2C:39-4(a), [p]ossession of a [w]eapon for an [u]nlawful [p]urpose; N.J.S.A. 2C:28-5(a)(l), [w]itness [t]ampering; and [c]onspiracy to [c]ommit [s]aid [o]ffenses, in violation of N.J.S.A. 2C:5-2.

[(Citations reformatted).]

Tanelli averred that "the [BCPO] will assign a taint team that will conduct the search" of the jail cells and review the evidence seized to safeguard communications and other evidence protected by the attorney-client privilege in accordance with State v. Martinez, 461 N.J. Super. 249, 301-02 (App. Div. 2019).

A judge approved the application and issued a search warrant, which was executed on November 3, 2022. The State sought to introduce the following items seized in the search of Torres's cell as evidence of witness tampering: (1) "three copies of the Rodriguez affidavit," (2) "a note referring to an affidavit that was discovered in a copy of the Bible," and (3) "stamps matching that on the envelop[e] of the Rodriguez affidavit." Torres moved to suppress the

12

evidence, arguing there was insufficient probable cause and that the execution of the warrant was done in a manner that exceeded the authority granted. After conducting oral argument, the judge denied the motion.

The judge found "sufficient probable cause" in the search warrant application to justify the issuance of the warrant for Torres's cell, noting that "[a] reasonable inference can be drawn that Torres engaged in a course of conduct that caused . . . Rodriguez to change his story as to Torres's involvement with the crime[s]." In support, the judge described the search warrant application in detail and applied the governing legal principles. The judge also concluded that the items seized "[fell] within the bounds of the search warrant." The judge issued a memorializing order and written opinion on January 5, 2023.[6]

Our review of the denial of a suppression motion is informed by well-settled principles. "Our constitutional jurisprudence has a preference for searches conducted with warrants." State v. Evers, 175 N.J. 355, 381 (2003). "[A] search executed pursuant to a warrant is presumed to be valid and . . . a defendant challenging its validity has the burden to prove 'that there was no probable cause supporting the issuance of the warrant or that the search was

---

[6] The judge also issued a supporting oral opinion on the record on January 3, 2023.

otherwise unreasonable.'" State v. Jones, 179 N.J. 377, 388 (2004) (quoting State v. Valencia, 93 N.J. 126, 133 (1983)).  "Accordingly, courts 'accord substantial deference to the discretionary determination resulting in the issuance of the [search] warrant,'" and any "[d]oubt as to the validity of the warrant '"should ordinarily be resolved by sustaining the search."'"  State v. Keyes, 184 N.J. 541, 554 (2005) (first alteration in original) (quoting Jones, 179 N.J. at 388-89).

In State v. Kasabucki, 52 N.J. 110 (1968), our Supreme Court underscored the limited role of reviewing courts when evaluating a challenge to a search warrant.  There, the Court determined that "[o]nce [a] judge has made a finding of probable cause on the proof submitted and issued the search warrant, a reviewing court, especially a trial court, should pay substantial deference to [that] determination."  Id. at 117.  Thus, "after-the-fact scrutiny of the sufficiency of an affidavit should not take the form of a de novo review" because "[a] grudging or negative attitude by reviewing courts is repugnant to the Fourth Amendment's strong preference for searches conducted pursuant to a warrant."  State v. Sheehan, 217 N.J. Super. 20, 27 (App. Div. 1987) (italicization omitted).

In evaluating the probable cause determination, "[t]he facts should not be reviewed from the vantage point of twenty-twenty hindsight by interpreting the

supporting affidavit in a hypertechnical, rather than a commonsense[,] manner." Ibid. Instead, "[p]robable cause for the issuance of a search warrant requires 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" State v. Chippero, 201 N.J. 14, 28 (2009) (quoting United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993)). Stated differently, probable cause has been described as a "'common-sense, practical standard' dealing with 'probabilities' and the 'practical considerations of everyday life,'" and is generally understood to mean "'less than legal evidence necessary to convict though more than mere naked suspicion.'" Evers, 175 N.J. at 381 (first quoting State v. Sullivan, 169 N.J. 204, 211 (2001); and then quoting State v. Mark, 46 N.J. 262, 271 (1966)).

To determine whether there is probable cause in a search warrant application, "[o]ur analysis begins with a review of the four corners of [the] affidavit and the 'totality of circumstances' presented in that affidavit to determine the sufficiency of information offered in support of the warrant." Id. at 380-81 (citing Illinois v. Gates, 462 U.S. 213, 230-31 (1983)). Indeed, we must "consider the totality of the circumstances when assessing the reasonable probabilities that flow from the evidence submitted in support of a warrant application." Chippero, 201 N.J. at 27.

Applying these principles, we agree with the judge that probable cause existed for the issuance of the warrant. Considering the totality of the circumstances, including the "'specialized experience and work-a-day knowledge of [police officers]' and 'the practical considerations of everyday life on which reasonably prudent and experienced police officers act,'" State v. Jones, 308 N.J. Super. 15, 31 (App. Div. 1998) (quoting Kasabucki, 52 N.J. at 117), there was a fair probability that Torres engaged in witness tampering and that his cell contained evidence of the crime. To hold otherwise would ignore "the Supreme Court's advice that the preference for police to resort to a warrant requires that 'in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.'" Id. at 32 (quoting United States v. Ventresca, 380 U.S. 102, 106 (1965)).

Torres also claims the warrant "was executed in a constitutionally overbroad fashion because the police seized all of [Torres]'s possessions, not just those that appeared to be evidence of the crime being investigated."

"If police actions in executing a warrant are objectively reasonable, there is no constitutional violation." State v. Rockford, 213 N.J. 424, 441 (2013) (citing Illinois v. Rodriguez, 497 U.S. 177, 185, 188 (1990)).

> Evaluating the constitutionality of police conduct in executing a warrant, "the basic test under both the

16                                                                    A-3269-22

Fourth Amendment to the United States Constitution and Article I, Paragraph 7, of the New Jersey Constitution is the same: was the conduct objectively reasonable in light of 'the facts known to the law enforcement officer at the time of the search.'"

[Ibid. (quoting State v. Handy, 206 N.J. 39, 46-47 (2011)).]

"An analysis of the reasonableness of the methods used in a search, as well as the areas searched, should focus upon whether the search in its totality was consistent with the object of the search." State v. Reldan, 100 N.J. 187, 195 (1985). "That analysis begins first with an examination of the terms of the search warrant, which must be strictly respected." State v. Bivins, 435 N.J. Super. 519, 524 (App. Div. 2014) (citing Rockford, 213 N.J. at 441). "Thereafter, the analysis focuses upon police conduct in accomplishing the object of the search." Ibid. (citing State v. Rodriguez, 399 N.J. Super. 192, 200 (App. Div. 2008)).

In the ordinary case where articles of personal property are seized pursuant to a valid warrant, and the seizure of some of them is illegal as beyond the scope of the warrant, those illegally taken may be suppressed, or excluded at the trial, but those within the warrant do not become so tainted as to bar their receipt in evidence.

[State v. Dye, 60 N.J. 518, 537 (1972).]

Here, given the place to be searched, the search warrant execution was objectively reasonable and the items sought to be admitted at trial did not exceed the scope of the search warrant. Therefore, there was no constitutional violation. Any items seized that may have violated attorney-client privilege were subject to review by a taint team, a remedy we deemed acceptable in Martinez, 461 N.J. Super. at 254-55 (requiring the prosecutor's office to create taint teams to proceed independently in a narcotics case and possible attorney misconduct case where the prosecution secretly recorded defense counsel's pre-trial interview of a State witness in the narcotics case because of a suspicion that the attorney would offer the witness a bribe). Because the search warrant and its execution were constitutional, the judge correctly denied Torres's motion to suppress.

III.

In Point II of Torres's brief and Point I of Burgos's brief, defendants challenge the judge's denial of their respective motions to dismiss the indictment. Both Torres and Burgos assert that Kevin Matthew, who was a detective with the BCPO at the time of the robbery/homicide investigation and the State's sole witness at the grand jury proceeding, gave "improper and speculative opinion testimony" that "compromised the fairness and reliability of the [g]rand [j]ury process." They also contend that the case "should be

remanded" for "the trial court to consider whether the serious evidence-tampering charges pending against . . . Matthew weigh on the validity of the indictment that depended solely on his testimony."  Additionally, Burgos argues that "the prosecutor abused their discretion" by failing to present his exculpatory denial.

As a threshold matter, the State argues that by entering a non-conditional guilty plea,[7] Torres waived his right to challenge the denial of his motion to dismiss the indictment on appeal.  We agree.  "Generally, a guilty plea constitutes a waiver of all issues which were or could have been addressed by the trial judge before the guilty plea."  State v. Davila, 443 N.J. Super. 577, 585 (App. Div. 2016) (quoting State v. Robinson, 224 N.J. Super. 495, 498 (App. Div. 1988)).  Thus, subject to certain exceptions that are not applicable here, "[w]hen a criminal defendant has solemnly admitted in open court that he [or she] is in fact guilty of [an] offense . . . , [the defendant] may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."  State v. Knight, 183 N.J. 449, 470 (2005) (quoting Tollett v. Henderson, 411 U.S. 258, 267 (1973)).

---

[7]  Torres reserved his right to challenge "any and all in limine motions and severance motions," neither of which are implicated here.

"Rule 3:9-3(f)[] expressly authorizes a defendant to 'enter a conditional plea of guilty reserving on the record the right to appeal from the adverse determination of any specified pretrial motion.'" Id. at 471. Because Torres did not reserve the right to appeal the motion to dismiss the indictment as a condition of his guilty plea and no other exception applies, we decline to consider Torres's argument. In our view, based on the record before us, adherence to the requirements of Rule 3:9-3(f) will not result in an injustice. See State v. Gonzalez, 254 N.J. Super. 300, 304 (App. Div. 1992) (considering an issue on appeal notwithstanding the defendant's entry of a non-conditional guilty plea because "[s]trict adherence to the requirements of R[ule] 3:9-3(f) 'would result in an injustice'" (quoting R. 1:1-2)). We will, however, consider Burgos's challenge because he did expressly reserve the right to appeal the denial of his motion to dismiss the indictment.

Turning to the governing principles,

> "[a] trial court's denial of a motion to dismiss an indictment is reviewed for abuse of discretion." State v. Twiggs, 233 N.J. 513, 544 (2018). Under that standard, "[w]e will not disturb the denial of such a motion 'unless [the judge's discretionary authority] has been clearly abused.'" State v. Saavedra, 433 N.J. Super. 501, 514 (App. Div. 2013) (quoting State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994)). "However, we review the trial court's legal conclusions

de novo."  State v. Nicolas, 461 N.J. Super. 207, 211 (App. Div. 2019).

[State v. Tucker, 473 N.J. Super. 329, 341-42 (App. Div. 2022) (alterations in original) (citation reformatted).]

To return an indictment, a grand jury "must determine whether the State has established a prima facie case that a crime has been committed and that the accused has committed it."  State v. Hogan, 144 N.J. 216, 227 (1996) (italicization omitted).  "The grand jury's role is not to weigh evidence presented by each party, but rather to investigate potential defendants and decide whether a criminal proceeding should be commenced."  Id. at 235.  "Credibility determinations and resolution of factual disputes are reserved almost exclusively for the petit jury."  Ibid.  As such, "[a]n indictment may be based largely or wholly on hearsay and other evidence which may not be legally competent or admissible at the plenary trial."  State v. Holsten, 223 N.J. Super. 578, 585 (App. Div. 1998) (alteration in original) (quoting State v. Schmidt, 213 N.J. Super. 576, 584 (App. Div. 1986), rev'd on other grounds, 110 N.J. 258 (1988)).

Generally, the prosecutor is not required to "construct a case for the accused or search for evidence that would exculpate the accused."  Hogan, 144 N.J. at 238.  However, when a prosecutor's file contains credible, material, and "clearly exculpatory evidence that directly negates a prospective defendant's

guilt," that evidence must be provided to the grand jury. Id. at 237. Under that standard, a prosecutor's duty "is triggered only in the rare case in which the prosecutor is informed of evidence that both directly negates the guilt of the accused and is clearly exculpatory." Ibid. (emphasis omitted). Stated differently, the exculpatory evidence must "squarely refute[] an element of the crime in question." Ibid. (emphasis omitted).

"If evidence of that character is withheld from the grand jury, the prosecutor, in essence, presents a distorted version of the facts[] and interferes with the grand jury's decision-making function." Id. at 236 (citation omitted) (citing Peter Arenella, Reforming the Federal Grand Jury and the State Preliminary Hearing to Prevent Conviction Without Adjudication, 78 Mich. L. Rev. 463, 551 (1980)). On the other hand, "the State need not impeach the credibility of the State's witnesses appearing before the grand jury by informing the grand jury of the witnesses' criminal records." Id. at 237. Likewise, "an accused's self-serving statement denying involvement in a crime, although such a statement directly negates guilt, ordinarily would not be sufficiently credible to be 'clearly exculpatory,' and need not be revealed to the grand jury." Id. at 238.

22

"Once the grand jury has acted, an 'indictment should be disturbed only on the "clearest and plainest ground,"' and only when the indictment is manifestly deficient or palpably defective."  Id. at 228-29 (citation omitted) (quoting State v. Perry, 124 N.J. 128, 168-69 (1991)).

> Consequently, "[a] trial court . . . should not disturb an indictment if there is some evidence establishing each element of the crime to make out a prima facie case," and the trial court "should evaluate whether, viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, a grand jury could reasonably believe that a crime occurred and that the defendant committed it." State v. Morrison, 188 N.J. 2, 12-13 (2006).  "In that task, we acknowledge that . . . grand jury proceedings are entitled to a presumption of validity . . . ." [State v. Francis, 191 N.J. 571, 587 (2007)].
>
> [Tucker, 473 N.J. Super. at 344-45 (first alteration in original).]

And, "only in the exceptional case will a prosecutor's failure to present exculpatory evidence to a grand jury . . . constitute grounds for challenging an indictment."  Hogan, 144 N.J. at 239.

Here, the judge did not abuse her discretion in denying Burgos's motion to dismiss the indictment.  Based on Matthew's testimony, the grand jurors were told that on June 29, 2019, Duque-Soto's friend walked into police headquarters to report that Duque-Soto had been shot in his (Duque-Soto's) apartment.

23

According to the friend, "he had been in the bathroom, he had heard a commotion, and then he heard multiple gun shots coming from the rest of the apartment." He "stayed inside the bathroom for several minutes" before he exited and saw "Duque-Soto struggling to breathe with an apparent gunshot wound."

Police responded to Duque-Soto's Fairview apartment and found his body lying on the floor "with blood surrounding his head." Duque-Soto was pronounced dead that evening from two gunshot wounds. At the apartment, police recovered ballistics evidence leading Matthew to conclude that three shots had been fired from two different guns. Police also recovered drug paraphernalia and ammunition in the apartment. Inside a couch cushion, police found a blue Guess bag containing marijuana, "two small bags of [a] white powdery substance," and a .22 caliber Jennings handgun.

During the investigation, a neighbor reported "that earlier that evening he had observed . . . what he believed to be a suspicious" green "older model Toyota" with "a New Jersey temporary registration tag" "parked in front of the crime scene." The neighbor saw "four males congregating near the vehicle" and said he believed the driver was wearing "either a red or orange [du]rag." Police also recovered surveillance footage from two separate cameras with different

camera angles. One camera's footage depicted three individuals, one of whom matched the neighbor's description, going into the building where Duque-Soto's apartment was located. The same three individuals were seen running out of the building shortly thereafter.

The second camera's footage showed the Toyota Corolla the neighbor had described being "follow[ed] closely behind [by a] brown Lexus . . . with the rear bumper missing." The video showed the Toyota "pull up" and "park," and "those three individuals [who] were observed going into the residence and running from the residence were observed coming out of that Toyota Corolla and then running back into that Toyota Corolla." When the three individuals exited the Toyota, the brake light went on, indicating "that there was a fourth person in that vehicle" in the driver's seat. The second camera's footage contained audio from which police heard sounds believed to be three gunshots. Matthew estimated that about a minute or a minute and a half passed between the three suspected gunshots and the three individuals returning to the Toyota Corolla.

Police sent out TRAK messages[8] seeking information on the green Toyota Corolla and brown Lexus. North Bergen Police Department responded that "an

_____

[8] According to Detective Matthew, a TRAK message is a written notification sent to other law enforcement agencies requesting information on an ongoing investigation.

individual named Dylan Rodriguez had been stopped driving a vehicle that matched [the] description [of the brown Lexus]." After observing a brown Lexus with a missing bumper parked in Rodriguez's driveway, police executed a search warrant on Rodriguez's home on July 1, 2019, which yielded a loaded Glock Model 43 .9-millimeter firearm, later determined to be stolen from the Delaware Valley Sports Center; three bags of marijuana; and drug paraphernalia. During the execution of the warrant, Rodriguez fled the home but was later apprehended.

In a statement to law enforcement, Rodriguez said that on the day of the shooting, he had called Martinez to purchase marijuana. Martinez contacted people, including Burke, to facilitate the transaction. Rodriguez paid Burke $500 for the marijuana purchase. According to Rodriguez, after the attempted transaction, Burke commented—in the presence of Rodriguez, Martinez, Torres, and Burgos—"that he had seen 'ma[d] weed' inside" Duque-Soto's apartment. The conversation led to a plan to "go[] back to rob . . . Duque-Soto." According to Rodriguez, after the planned robbery turned into a homicide, Martinez claimed that "Duque-Soto had a gun . . . that caused the others to get scared," leading to the shooting.

When the prosecutor asked Matthew whether "the claim that . . . Duque-Soto pulled a gun during that second encounter [was] supported by the evidence," Matthew responded it was not. He explained that police recovered the gun "from a bag that was secreted inside of the couch so the gun was not out at the time when [Duque-Soto] got shot." According to Matthew, Rodriguez initially stated that he left and did not participate in the robbery/homicide but later accepted a gun from Burgos that he knew had been involved in the shooting.

The TRAK message also generated a link between the Toyota Corolla and Burgos. Burgos provided a statement to law enforcement in which he "admit[ted] to going to . . . Duque-Soto's house to buy weed prior to the shooting" and "admit[ted] to going back a second time." During the course of the investigation, Burke and Martinez also gave statements. In his statement, Martinez admitted returning to Duque-Soto's apartment a second time to get marijuana but denied that he returned to rob Duque-Soto.

Burke admitted going to Duque-Soto's apartment the first time to buy marijuana but stated he never made the purchase because Duque-Soto pulled a gun on him. Upon exiting the apartment the first time, all five defendants went to a parking lot and concocted the scheme to return to Duque-Soto's apartment

a second time to rob him. According to Burke, Torres and Burgos planned the robbery and already had guns on them. When they returned to the scene, Burke went inside the apartment first, and then Torres and Burgos burst through the door and started shooting. After the shooting, they took ecstasy pills from the apartment and fled.

In denying the motion to dismiss the indictment, the judge found that "[t]he ballistics evidence, the [eyewitness] account, and the videos presented to the grand jury, taken together with the statements of the co-defendants, present some evidence of the charged criminal offenses on the part of . . . Torres[] and Burgos." The judge explained:

> The evidence shows that co-defendants endeavored to purchase marijuana from [the] victim. That initial attempt was not successful. Five individuals are seen on two cameras congregating in a parking lot near [the] victim's apartment, and three individuals are seen going back toward the apartment. In the intervening moments, three shots are heard on the audio-video tapes presented to the grand jury. The three individuals are seen running out and back toward the Toyota. Vehicles tied to the co-defendants are seen on the camera. Ballistics evidence demonstrates that three shots were fired from two separate weapons. One of those weapons was found in the apartment of Rodriguez, who purportedly received it from Burgos.
>
> The statements of . . . co-defendants Burke, Burgos and Rodriguez lend further support to the charged offenses. Burke told police that Torres and

> Burgos entered [the] victim's apartment and fired weapons. Rodriguez admitted that after the first attempt to buy drugs, all five co-defendants, Burke, Martinez, Torres, Burgos, and Rodriguez[,] discussed returning later to the apartment to rob [the] victim. Rodriguez told police that he left, but Burke, Martinez, Torres and Burgos stayed behind. Burgos admitted the plan to rob [the] victim, admitted going back to [the] victim's apartment prior to the shooting, [and] admitted that shots were fired and that Burke and Torres were also present. A search warrant later executed at Torres'[s] apartment yielded a sawed[-]off [shotgun].

Given the "totality of the evidence presented to the grand jury," the judge correctly found "some evidence of the involvement of . . . Torres[] and Burgos" in the crimes charged to sustain the indictment.

Burgos argues that when asked whether "the claim that . . . Duque-Soto pulled a gun during that second encounter [was] supported by evidence," Matthew responded with improper speculation that was "a major leap from the facts and co-defendant statements available to the prosecution at the time." Specifically, Matthew improperly responded that the claim was not supported by the evidence because "the gun was recovered from a bag that was secreted inside of the couch so the gun was not out at the time when he got shot."

In rejecting Burgos's contention in this regard, the judge found:

> Burke told the police that after the shooting took place, Burgos and Torres lifted the couch cushion in [the] victim's apartment, apparently searching for [the]

29

victim's gun.[9]  That gun was secured in a Guess bag, in a cushion in [the] victim's sofa.  Matthew's testimony clarified that point.  Matthew testified about his observations offering an explanation for his belief that [the] victim could not have had a gun during the shooting.  Matthew's observations were supported by Burke's statement that after the shooting, Burgos and Torres searched for a gun in [the] victim's sofa, but could not find it.  Matthew's testimony on this point does not form a basis for dismissal of the indictment against . . . Torres and Burgos.

We agree with the judge that Matthew's testimony did not render the indictment "manifestly deficient or palpably defective."  Hogan, 144 N.J. at 229.  It is undisputed that the testimony was not the type of expert testimony prohibited in grand jury proceedings by Tucker, 473 N.J. Super. at 348-49.  Instead, it was based on Matthew's observations at the scene and supported by the evidence in the record.  "[G]rand jury presentations are not full-fledged trials at which the State must prove a defendant's guilt beyond a reasonable doubt.  Prosecutors typically make abbreviated presentations to the grand jury that are designed to satisfy the lower standard of probable cause."  State v. Shaw, 241 N.J. 223, 238 (2020).  Indeed, the evidentiary rules are relaxed in grand jury

---

[9]  The judge noted that "Burke's statement directly contradict[ed] Martinez's statement that [the] victim had a gun at the time of the shooting."

proceedings "to the extent permitted by law" "to admit relevant and trustworthy evidence in the interest of justice." N.J.R.E. 101(a)(3)(D).

The crux of Burgos's argument is that Matthew improperly expressed his opinion on a major factual dispute when he testified that Duque-Soto did not display a gun during the robbery. However, Burgos's culpability for the murder charge presented to the grand jury would not be mitigated by the victim displaying a gun in his own home for his own defense. See Model Jury Charges (Criminal), "Justification—Use of Force Upon an Intruder (N.J.S.A. 2C:3-4(c))" (rev. Sept. 12, 2016).

Burgos invites us to "remand for the trial court to consider whether the pending charges of evidence-tampering against Detective Matthew affect the validity of the indictment." By way of background, on December 19, 2023, Matthew was charged by complaint-warrant with official misconduct and tampering with evidence for conduct allegedly occurring from October 2022 to November 2023. The State counters that "Matthew's alleged criminal activity in 2022-2023 has no effect on the validity of [defendant's] 2019 indictment."

In United States v. Guillette, 547 F.2d 743 (2d Cir. 1976), the court commented on the impact of post-indictment events on the validity of the underlying indictment, explaining:

> [W]e decline to adopt the proposition that grand jury testimony that has merely been thrown open to suspicion by postindictment events is an invalid basis for an indictment. Such a rule of law would necessitate independent judicial review of the credibility of grand jury witnesses, an exercise that would seriously infringe upon the traditional independence of the grand jury. We consequently hold that where subsequent events merely cast doubt on the credibility of grand jury witnesses, due process does not require the prosecution to notify the grand jury of those events and seek a new indictment.
>
> [Id. at 753.]

We agree with the Guillette court's reasoning. Indeed, as our Supreme Court has explained, "the State need not impeach the credibility of the State's witnesses appearing before the grand jury by informing the grand jury of the witnesses' criminal records." Hogan, 144 N.J. at 237. Thus, under the circumstances, Matthew's current criminal charges have no effect on the earlier indictment.

Equally unavailing is Burgos's contention that the State failed to present his exculpatory statement. Specifically, although he admitted "that he left the car and went towards the apartment for the planned robbery," he contends his insistence "that he was not present inside the apartment when the shooting . . . occurred" should have been presented to the grand jury. In rejecting Burgos's argument, the judge explained:

Burgos'[s] denials are not clearly exculpatory, and therefore, the State had no obligation to present his denial to the grand jury. Indeed, there was ample evidence in the record to support the State's contention that Burgos was the shooter, including the statements of both Rodriguez and Burke, and the video footage showing Burgos running toward and away from [the] victim's apartment. . . . [T]he State properly analyzed the exculpatory value of the evidence in the context of the nature and source of the evidence, and the strength of the State's case as well as the potential bias on [the] part of a witness. Under the circumstances the State had no obligation to present Burgos'[s] denial. The State acted properly when it determined not to present Burgos'[s] self-serving statement to the grand jury.

"[A]n accused's self-serving statement denying involvement in a crime . . . ordinarily would not be sufficiently credible to be 'clearly exculpatory,' and need not be revealed to the grand jury." Hogan, 144 N.J. at 238. The exculpatory value of the evidence "should be analyzed in the context of the nature and source of the evidence, and the strength of the State's case." Id. at 237. Based on that analysis, we agree with the judge's ruling that Burgos's denial was not clearly exculpatory evidence and the prosecutor therefore had no obligation to present it to the grand jury.

IV.

In Point III of Torres's brief and Point II of Burgos's brief, defendants challenge their respective sentences as excessive.

33

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)).  Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

"While the sentence imposed must be a lawful one, the court's decision to impose a sentence in accordance with the plea agreement should be given great respect, since a 'presumption of reasonableness . . . attaches to criminal sentences imposed on plea bargain defendants.'"  State v. S.C., 289 N.J. Super. 61, 71 (App. Div. 1996) (quoting State v. Sainz, 107 N.J. 283, 294 (1987)); see also Fuentes, 217 N.J. at 70 ("A sentence imposed pursuant to a plea agreement is presumed to be reasonable . . . ."); State v. Wright, 444 N.J. Super. 347, 367 (App. Div. 2016) (explaining that deference is particularly warranted where a "defendant has bargained for the sentence imposed pursuant to a plea agreement").

In imposing sentence, as to Torres, the judge found aggravating factors three and nine based on the risk of re-offense and the need for deterrence, respectively.  See N.J.S.A. 2C:44-1(a)(3), (9).  The judge placed minimal weight on aggravating factor three, finding that Torres exhibited "particularly brutal decision[-]making . . . [and] behavior in deciding to shoot . . . and kill . . . [Duque-Soto]."  But the judge "placed the greatest weight on aggravating factor nine," explaining:

> How are we to feel safe in our homes?  How [do] we feel safe on the streets when people can randomly get guns and kill people . . . for no good reason, none whatsoever?
>
> This factor is the greatest factor in this case. . . . We cannot send a message that random shootings and random killings will [not] be met with serious consequences.  That is what this case is about.

Because Torres had no prior juvenile or adult criminal history, would face a hardship from his imprisonment given his youth, and was nineteen years old at the time of the crimes, the judge found mitigating factors seven, eleven, and fourteen, respectively.  See N.J.S.A. 2C:44-1(b)(7), (11), (14).  However, the judge rejected mitigating factor two, N.J.S.A. 2C:44-1(b)(2), that Torres did not "contemplate serious harm," finding:

> When someone has a gun in their waistband, there[ is] no argument to be made to this [c]ourt that they did[

35

not] contemplate serious harm. Now, maybe . . . Torres did[ not] go in that day thinking that he was going to kill someone, but it[ is] highly foreseeable that when you have a gun in your hand, someone is going to die, and, especially when your idea that day is to commit a robbery.

The judge also rejected mitigating factor four, N.J.S.A. 2C:44-1(b)(2), that there existed substantial grounds tending to excuse Torres's conduct, dismissing his contention that he "was peer pressured and intimidated into carrying a firearm into the robbery" because "[t]he facts simply do[ not] support that." Likewise, the judge rejected mitigating factors eight, N.J.S.A. 2C:44-1(b)(8), that Torres's conduct was the result of circumstances unlikely to recur, and nine, N.J.S.A. 2C:44-1(b)(9), that his character and attitude indicated he was unlikely to reoffend, given the "particularly violent crime in the shooting and killing of . . . [Duque-Soto] and [Torres's] efforts to conceal his involvement and the finding of a sawed[-]off shotgun in his residence."

Considering "the totality of the circumstances of this case and the aggravating and mitigating factors," the judge was "clearly convinced that the aggravating factors substantially outweigh[ed] the mitigating factors" and sentenced Torres to an aggregate term of thirty years in prison, subject to NERA, in accordance with the plea agreement. The judge acknowledged her authority to "deviate" from the plea agreement and impose a lesser sentence but found that

36

"this [was] a very reasonable plea agreement given the charges that these defendants faced."

As to Burgos, the judge found aggravating factors three, six, and nine based on the high risk of re-offense, the extent of defendant's prior juvenile record, and the need for deterrence, respectively. See N.J.S.A. 2C:44-1(a)(3), (6), (9). In support, as to factors three and six, the judge explained that although this was Burgos's first indictable conviction:

> [H]e was adjudicated as delinquent . . . six times as a juvenile[ and] he exhibited serious brutality and disregard for human life when he chose to shoot . . . [Duque-Soto] in this case. And, . . . defendant, along with his co-defendants[,] left the victim to die on . . . an apartment floor.
>
> After the crime, . . . Burgos concealed one of the murder weapons . . . . The [c]ourt recognizes the substance abuse and mental health . . . concerns that were set forth in the [presentence investigation] and I do hope that he receives the treatment that he needs in State Prison.
>
> But, there is a risk of-reoffending and that risk still exists . . . .

The judge "placed the greatest amount of weight on aggravating factor nine," expounding:

> What kind of a society do we live in where [young men] can enter an apartment . . . with guns and shoot somebody down? What type of a society is this that this

37

occurs? . . . [I]t occurs all too frequently and tragically it occurred here.

There has to be something that stops this type of conduct. There has to be deterrence. And, that is why I place the greatest amount of weight on aggravating factor nine. Killing of another human being is the most serious of crimes[,] and the need for general deterrence cannot be overstated.

. . . [D]efendant determined to shoot . . . Duque-Soto during the course of an armed robbery. . . . [I]t was[ not] I walk into an apartment, I pull out a gun, I feel danger and I kill somebody.

It was . . . planned from . . . that second stop to the Delta gas station back to that apartment. This was a thought[-]out, planned[-]out event which started as a robbery and culminated into a homicide . . . .

The decision exhibited a complete disregard for human life. . . . [So,] I placed the greatest amount of weight on aggravating factor nine.

The judge found mitigating factors eleven and fourteen based on the hardship incarceration imposed on Burgos's six-year-old daughter and Burgos's youth at the time of the crimes.[10] See N.J.S.A. 2C:44-1(b)(11), (14). However, the judge rejected Burgos's request to apply mitigating factor thirteen, N.J.S.A. 2C:44-1(b)(13), that as a youthful offender, he was substantially influenced by someone more mature, explaining:

_____

[10] Burgos was nineteen years old.

[A]ll of these co-conspirators were young men. They were all young. I do[ not] see . . . Burke as, in any way, influencing or prompting either of these two defendants. And, when I read the letter that was submitted to this [c]ourt, I understand that you experienced tremendous growth over the last four years, but I get a sense from you . . . that nobody can tell you what to do. You make your own decisions. So, I reject mitigating factor [thirteen].

Considering "the totality of the circumstances and weighing the aggravating and mitigating factors," the judge was "clearly convinced that the aggravating factors substantially outweigh[ed] the mitigating factors." The judge honored the plea agreement as serving the interests of justice and sentenced Burgos to an aggregate term of thirty years in prison, subject to NERA.

We discern absolutely no abuse of discretion in the judge's sentencing decisions, which are amply supported by credible evidence in the record. "[W]hen the aggravating factors preponderate," as occurred here, "sentences will tend toward the higher end of the range." Case, 220 N.J. at 64-65 (quoting State v. Natale, 184 N.J. 458, 488 (2005)). Deference is also particularly warranted where, as here, defendants received their "bargained[-]for" sentences. Wright, 444 N.J. Super. at 367.

Relying on their youthfulness, defendants make various arguments, including social science arguments, attacking the judge's exercise of her sentencing discretion. "A defendant's age is doubtlessly among the information that courts should consider when calibrating a fair sentence," and "[a]ssessing the overall fairness of a sentence requires a real-time assessment of the consequences of the aggregate sentences imposed, which perforce includes taking into account the age of the person being sentenced." State v. Torres, 246 N.J. 246, 273 (2021). But while "age is a fact that can and should be in the matrix of information assessed by a sentencing court," "age alone cannot drive the outcome." Id. at 273-74.

Instead, contrary to defendants' contentions, deterrence remains "one of the most important factors in sentencing," State v. Megargel, 143 N.J. 484, 501 (1996), and the need for deterrence directly correlates with the nature of the offense, Fuentes, 217 N.J. at 79. As the judge recounted during sentencing, defendants planned and committed an extremely violent crime as they shot and killed a man in his own home. We are satisfied the judge meticulously adhered to the sentencing principles in identifying and applying the aggravating and mitigating factors, and imposed a sentence that does not shock the judicial conscience. Because the judge's explanation was clear, detailed, and supported

by competent, credible evidence in the record, there is no basis to disturb the judge's findings.

To the extent we have not addressed any specific arguments, it is because they lack sufficient merit to warrant discussion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3269-22